UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| ROBERT ROMERO | CIVIL ACTION NO. 23-0442 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| WESTWIND HELICOPTERS INC., ET AL. | MAGISTRATE JUDGE WHITEHURST |

*consolidated with*

| | |
|---|---|
| JEREMY HOLLIER | CIVIL ACTION NO. 23-0484 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| WESTWIND HELICOPTERS INC., ET AL. | MAGISTRATE JUDGE WHITEHURST |

## MEMORANDUM RULING

Before the Court are two Daubert Motions: (1) Defendant Westwind Helicopters, Inc.'s ("Westwind") Daubert Motion to Exclude Certain Opinions of Plaintiff's Expert, David Downey (Record Document 64); and (2) Westwind's Daubert Motion to Exclude Certain Opinions of Plaintiffs' Expert, Ankur Lodha (Record Document 63). The motions are fully briefed. See Record Documents 63, 64, 68, 71, 72, 74, 75. For the reasons set forth below, the Daubert Motions are **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

A full recitation of the facts in this case are set forth in this Court's prior Memorandum Ruling on Defendants' Motion for Summary Judgment. See Record Document 76. In brief, this litigation arises out of the crash of a Bell 407 helicopter operated by Westwind on October 26, 2022, during a return flight from an offshore platform in the Gulf of Mexico to Abbeville, Louisiana. See Record Document 76 at 1–2. The helicopter, piloted by James Bullock ("Bullock"), crashed into the Gulf after Bullock

became unconscious during the flight. See id. at 2. Plaintiffs Robert Romero ("Romero") and Jeremy Hollier ("Hollier") were passengers on the flight and survived the crash. See id. They allege that Westwind's negligence contributed to their injuries. To support their claims, Plaintiffs retained two experts: David Downey ("Downey"), an aviation operations and safety specialist, and Dr. Ankur Lodha ("Dr. Lodha"), a board-certified interventional cardiologist. See Record Documents 71-2 at 1, 64-2 at 2.

Downey was retained to evaluate Westwind's compliance with regulatory rules and best practices in the industry. See Record Document 64-2 at 2. His initial report and rebuttal address (1) the malfunction and maintenance of the aircraft's Emergency Locator Transmitter ("ELT"); (2) the adequacy of Westwind's Emergency Response Plan ("ERP"); (3) Westwind's Safety Management System ("SMS") and General Operations Manual ("GOM"); and (4) the sufficiency of passenger safety briefings. See Record Documents 64-2 & 67-9. Downey concludes that Westwind failed to maintain an adequate safety culture, that the ELT paperwork and inspection records were deficient, and that Westwind's delay in notifying the Coast Guard unreasonably prolonged Plaintiffs' rescue. See Record Documents 64-2 & 67-9.

Dr. Lodha was retained to opine on the medical cause of Bullock's incapacitation. See Record Document 71-1. In his initial report, he concluded that Bullock "more likely than not" suffered a cardiac arrhythmia. See id. at 3. He also opined that Bullock did not suffer a heart attack, stroke, or pulmonary embolism. See id. Dr. Lodha revised his opinions in a rebuttal report agreeing with Dr. Marc Sintek, Westwind's medical expert, that the precise cause of Bullock's loss of consciousness "cannot be determined." See Record Document 71-2. He nevertheless maintained that, after an initial blackout

2

episode, Bullock was "neurologically intact" and "had sufficient time after his prodrome where he could have landed the helicopter safely." See id.

Defendants now move to exclude both experts under Federal Rules of Evidence 702 and 703 and Daubert v. Merrell Dow Pharmaceuticals, Inc.. See 509 U.S. 579 (1993). As to Downey, Defendants argue that his opinions lack reliable methodology, have no proper factual or scientific basis, and extend beyond his qualifications. See Record Document 64-1 at 2. Defendants particularly object to his conclusions regarding the ELT malfunction, injury causation, rescue delay, passenger briefings, and Westwind's SMS system and GOM. See id. at 3–9. As to Dr. Lodha, Defendants argue that his medical opinions are internally inconsistent, speculative, and outside his cardiology expertise, especially his assertion that the pilot could have landed the helicopter safely. See Record Document 63-1 at 3–10. Plaintiffs oppose both motions, asserting that each expert is qualified, that their methodologies are reliable, and that any alleged weaknesses go to the weight of the testimony rather than admissibility. See Record Documents 68, 71.

## LAW & ANALYSIS

I. **Relevant Standards of Law**

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703 and the standards articulated in Daubert. See 509 U.S. 579. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

>   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. According to the Daubert Court, Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at 597; see Fed. R. Evid. 702.

Rule 703 provides that "[a]n expert may base an opinion on facts or data … that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Additionally, Rule 702 states that those facts or data "need not be admissible for the opinion of the expert to be admissible." Id. However, when the underlying facts or data are inadmissible, they may be disclosed to the jury "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Id.

Daubert provided an illustrative list of factors for courts to use when evaluating an expert's reliability. See Jackson v. N. Caddo Hosp. Serv. Dist., 2024 WL 697587, at *2 (W.D.La., 2024) (citing Daubert, 509 U.S. at 592–94). The factors include "whether [the expert's opinion] has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." Daubert, 509 U.S. at 580. The Daubert Court added, that "[t]he inquiry is a flexible one …." Id. "In short, expert testimony is admissible only if it is both relevant and reliable." Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002).

The Fifth Circuit has emphasized that expert testimony must be grounded in "the methods and procedures of science" rather than "subjective belief or unsupported speculation." Moore v. Ashland Chem., Inc., 151 F.3d 269, 275 (5th Cir. 1998). The

4

proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. See id. at 276. However, the proponent need not prove that the expert's opinion is correct, but only that it is reliable. See id.

Ultimately, the Court must determine whether the expert is qualified, whether the methodology is reliable, and whether the testimony will assist the trier of fact. If these conditions are not met, exclusion is warranted, but "[t]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's note (2000).

## II. Analysis of Downey's Expert Testimony

Defendants seek to exclude portions of Downey's opinions. See Record Document 64. Downey is an aviation professional who has served as a pilot, flight instructor, and safety manager. See Record Document 64-2 at 2. Downey's expert report addresses several categories of Westwind's conduct, and Westwind has objected to multiple of Downey's opinions. However, in light of this Court's prior Memorandum Ruling (Record Document XX), many of the issues raised in Westwind's Daubert Motion (Record Document 64) are mooted. The Court will address each of Westwind's challenges to Downey's opinions below.

### A. Non-Activation of the ELT

Defendants contend that Downey's opinions concerning the alleged malfunction of the ELT should be excluded. See Record Document 64-1 at 3. The Court's summary judgment ruling resolved Plaintiffs' claim of negligent ELT maintenance in Westwind's favor, finding no competent evidence that the ELT malfunctioned due to improper maintenance or documentation. See Record Document 76. Because those findings

render this category of testimony immaterial to any remaining issue, Westwind's Daubert motion as to Downey's ELT opinions is **DENIED AS MOOT.**

B. Causation of Plaintiffs' Injuries

Defendants next move to exclude Downey's statements attributing Plaintiffs' injuries to the impact sequence or to alleged delays in rescue, arguing that he lacks medical qualifications and that such opinions are not helpful to the jury. See id. at 4.

To the extent Downey opines that Plaintiffs "were injured due to high impact forces" or that delays in rescue caused injuries to worsen, such opinions fall outside his expertise and lack a medical foundation, as it is indisputable that Downey was not presented as a medical expert. See Record Document 64-2 at 11. The Court therefore finds those opinions inadmissible under Rule 702. See Fed. R. Evid. 702. However, Downey may offer general testimony, within the scope of his aviation expertise, describing the crash dynamics or how the impact forces would typically be experienced by passengers. Any testimony explaining how the rescue delay contributed to Plaintiff's injuries is **DENIED AS MOOT** considering the Court's prior Memorandum Ruling. See Record Document 76. Therefore, the Daubert Motion on Downey's opinions regarding the cause of Plaintiff's injuries is **GRANTED IN PART and DENIED IN PART**.

C. Timeliness of Rescue and Westwind's Emergency Response Plan

Defendants also challenge Downey's opinions that Westwind's post-crash emergency response was untimely and inconsistent with its own ERP. See Record Document 64-1 at 4–6. Downey opined that Westwind's delay in notifying the Coast Guard and dispatching its company helicopter for search and rescue efforts fell below industry standards and contributed to Plaintiffs' injuries. See Record Document 64-2.

6

The Court has already granted summary judgment in favor of Defendants on Plaintiffs' claim of negligent notification and rescue. See Record Document 76. The Court concluded that Plaintiffs presented no evidence linking any injury to Westwind's alleged delay or failure to comply with its ERP. See id. Because the underlying theory of liability has been dismissed, Downey's opinions concerning the timeliness or adequacy of Westwind's emergency response are no longer relevant to any remaining issue in this case. Accordingly, Westwind's Daubert motion to exclude Downey's opinions concerning Westwind's rescue efforts is **DENIED AS MOOT.**

D. Passenger Briefing

Downey also critiques Westwind's passenger briefing procedures. See Record Document 64-2. The Court's prior Memorandum Ruling (Record Document 76) held that Plaintiffs' negligent briefing claim is preempted and lacks evidentiary support. Accordingly, the Daubert motion on this category of opinion is **DENIED AS MOOT.**

E. Westwind's SMS and GOM

Defendants also challenge Downey's critiques about Westwind's safety management system ("SMS") and general operating manual ("GOM"). See Record Document 64-1 at 7. Defendants argue that these opinions are irrelevant because Plaintiffs have not shown that any alleged defect in the manuals or failure to follow the manuals caused the crash or injuries. To the extent Downey's SMS and GOM criticisms pertain solely to Westwind's corporate safety culture or regulatory paperwork, they are irrelevant and inadmissible under Federal Rules of Evidence 401, 402, and 702. Additionally, there is no evidence tying the SMS or GOM deficiencies to the crash or

7

Plaintiffs' injuries. Therefore, the Daubert motion is **GRANTED** with respect to opinions surrounding the SMS and GOM.

### F. Westwind's Allowing Bullock to Fly

Finally, Westwind contends that Downey's opinion that Westwind "allowed a pilot to operate a rotorcraft that resulted in the major injuries to the passengers" should be excluded because it is an attempt to assess fault against Westwind. See Record Document 64-1 at 9. The Court disagrees with Westwind. This statement merely contends that Bullock, a Westwind employee, was piloting the helicopter that crashed and injured Plaintiffs. This allegation is undisputed. Therefore, the Daubert Motion on this issue is **DENIED**.

### G. Conclusion

In sum, Downey is qualified to testify about aviation safety operations and flight procedures as relevant to the remaining issues. His opinions concerning the ELT, passenger briefings, and safety manual deficiencies are moot following summary judgment. His medical causation statements are excluded.

## III. Analysis of Dr. Lodha's Expert Testimony

Defendants also move to exclude the opinions of Plaintiffs' medical expert, Dr. Lodha, an interventional cardiologist who reviewed Bullock's medical history and autopsy findings. See Record Document 71-1. Plaintiffs retained Dr. Lodha to opine on the cause of Bullock's in-flight incapacitation and to address whether the pilot could have acted following his first episode of unconsciousness.

Dr. Lodha issued two reports. See Record Documents 71-1 & 71-2. In his initial report, he concluded that it was "more likely than not" that Bullock suffered an arrhythmia

8

that caused him to lose consciousness, while ruling out a heart attack, stroke, or pulmonary embolism as possible causes. See Record Document 71-1 at 3. In a later rebuttal report, Dr. Lodha agreed with Defendants' medical expert, Dr. Sinetek, that "the cause of the syncope at this time cannot be determined." See id. Nonetheless, he opined that after the initial blackout episode, Bullock "had sufficient time after his prodrome where he could have landed the helicopter safely." See id. Westwind's various challenges to Dr. Lodha's opinions will be addressed below.

    A.  Opinion that an Arrhythmia Caused the Blackouts

Westwind challenges Dr. Lodha's opinion that it was "more likely than not" that Bullock suffered from an arrhythmia, causing him to lose consciousness during the flight. Record Document 63-1 at 9 (quoting Record Document 71-1 at 3). Dr. Lodha also opines that "it will be difficult to point to the exact cause of loss of consciousness …." Record Document 71-1 at 3. Defendants challenge these opinions as speculative and inconsistent. See Record Document 63-1.

Dr. Lodha's conclusion that Bullock likely suffered from an arrhythmia is excluded under Federal Rule of Evidence 702. In Curtis v. M&S Petroleum, Inc., the Fifth Circuit stated that expert opinions "must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." 174 F.3d 661, 668 (5th Cir. 1999) (citing Daubert, 509 U.S. at 590). Although Dr. Lodha appears to infer an arrhythmia based on his ability to rule out other causes such as a heart attack, stroke, or pulmonary embolism, his report offers no testing, analysis, or medical reasoning demonstrating how he reached that conclusion. See Record Document 71-1. The report is brief, spanning only three pages, and contains no explanation of the scientific principles

9

or differential diagnosis process supporting his opinion. See id. Without that reasoning, the Court is left to speculate as to how Dr. Lodha concluded that an arrhythmia occurred. Therefore, Westwind's Daubert motion (Record Document 63) is **GRANTED** on this issue.

However, Dr. Lodha's discussion of the autopsy findings and his conclusion that the results rule out a heart attack, stroke, or pulmonary embolism is supported by the record and within his medical expertise. See id. That portion of his testimony is therefore admissible.

B.  Opinion that Bullock Could Have Acted after his First Blackout Episode

In his rebuttal report, Dr. Lodha opines that after his initial blackout episode, Bullock "could have landed the helicopter safely." See Record Document 71-2 at 2. To the extent Dr. Lodha suggests that Bullock was capable of flying or landing the helicopter, that opinion is inadmissible. See id. Dr. Lodha is a cardiologist, not an aviation expert, and he is not qualified to give opinions about flying an aircraft or operating flight controls.

However, in his rebuttal report, Dr. Lodha explains that regardless of the cause of the prodrome, patients who experience a brief blackout or syncopal episode often return to normal neurological and cognitive function for a short period before another episode occurs. See id. That portion of his testimony is within his medical expertise and is admissible to help explain the general medical understanding of what humans, including Bullock, experience between such blackouts.

For those reasons, Dr. Lodha may testify generally about how people normally function between episodes of syncope, but he may not give any opinions about Bullock's

specific ability to operate or land the helicopter. Therefore, Westwind's Daubert motion (Record Document 63) is **GRANTED IN PART and DENIED IN PART** on this issue.

### C. Speculative Opinions

In Dr. Lodha's initial report, he states that Losartan could have caused an arrhythmia due to electrolyte abnormalities and that additional medical testing "would have provided insights into the pilot's health." See Record Document 71-1 at 3. These opinions are inadmissible. Dr. Lodha does not cite any medical evidence showing that Bullock actually had an electrolyte imbalance or that Losartan played any role in his loss of consciousness. He also fails to explain what "insights" the additional testing would have provided or how those results would connect to the cause of the blackout. Additionally, any opinion about Bullock's compliance with medical testing or FAA certification is moot because the Court has already granted summary judgment on all claims involving Bullock's pre-flight medical fitness. See Record Document 76. Accordingly, Dr. Lodha's statements about Losartan and hypothetical medical testing are inadmissible.

### D. Conclusion

In summary, Dr. Lodha's opinion that Bullock likely suffered an arrhythmia and his statements regarding Losartan and additional medical testing are excluded as speculative and lacking reliable methodology. His opinion that Bullock could have landed the helicopter or otherwise operated it after the first blackout is also excluded, as it falls outside the scope of his expertise. However, Dr. Lodha's discussion of the autopsy findings and his opinion that Bullock likely regained normal cognition between syncopal episodes are admissible.

## CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Westwind's Daubert Motion to Exclude Certain Opinions of David Downey (Record Document 64) is **GRANTED IN PART and DENIED IN PART** as follows:

1. Downey's opinions concerning the ELT, ERP, and passenger briefings are **DENIED AS MOOT** in light of the Court's prior Memorandum Ruling (Record Document 76);

2. Downey's opinions on the causation of Plaintiffs' injuries and on Westwind's SMS and GOM are **EXCLUDED** under Federal Rule of Evidence 702;

3. Downey may testify, within his aviation expertise, about flight operations, crash dynamics, and safety procedures relevant to the surviving claims; and

4. Downey's statement that Bullock was the pilot operating the aircraft at the time of the crash is a permissible factual observation, not a legal conclusion.

**IT IS FURTHER ORDERED** that Westwind's Daubert Motion to Exclude Certain Opinions of Dr. Ankur Lodha (Record Document 63) is **GRANTED IN PART and DENIED IN PART** as follows:

1. Dr. Lodha's opinion that an arrhythmia caused Bullock's loss of consciousness is **EXCLUDED** under Rule 702 for lack of reliable methodology;

2. His discussion of the autopsy findings and his conclusion ruling out a heart attack, stroke, or pulmonary embolism are **ADMISSIBLE**;

3. His opinion that Bullock could have landed the helicopter or otherwise operated the aircraft after the first blackout is **EXCLUDED**, but he may testify about neurological function between syncopal episodes; and

4. His statements that Losartan could have caused an arrhythmia and that further testing would have provided insight into Bullock's health are **EXCLUDED** as speculative, and any opinions related to Bullock's pre-flight medical certification are **MOOT**.

An Order accompanying this Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 2nd day of December, 2025.

 

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE